## ALVIN ADAMS *v.* WOODS & HASKELL.—T. A. LYNCH *et al., Intervenors.*

The filing of a bill by one partner against his copartners for a dissolution and account, and praying for an injunction and receiver, and an appointment of a receiver by the Court, does not prevent a creditor from proceeding by attachment, and gaining a priority over other creditors, until a final decree of dissolution and order of distribution.

It is only in cases of insolvency, that the equitable rule for a *pro rata* distribution will apply, and then as of necessity.    If the firm be solvent, a creditor whose claim is due cannot be placed on a par with others whose claims are not yet due, or who have been less diligent in securing claims already due.

Funds in the hands of a receiver, in a suit for dissolution, are therefore subject to attachment at any time before a final decree of dissolution and distribution.

APPEAL from the District Court of the Fourth Judicial District.

The facts in this case are the same as those in the case of Adams *v.* Woods & Haskell, decided at the July Term, 1857, of this Court.    (7 Cal. R.)    By stipulation of counsel, the record in that case is made a part of the statement in this.

*J. A. McDougall* for Appellant.

In this case, a decree was rendered distributing the moneys to all the creditors *pro rata*, regardless of the claim of the intervenors.

The intervenors brought this case, by writ of error, to this

Court, when the whole question of intervenor's rights, as attachment and judgment-creditors, was discussed and the law settled by the Court.  Adams *v.* Haskell, July Term, 1857.

The Court below makes the *same decree* from which the intervenors had before appealed, thus ignoring the ruling of the Supreme Court.

Intervenors insist that they are entitled to an order of distribution to the attaching-creditors in the order of the priority of their respective liens.

*Shafter & Park* for Respondents.

BURNETT, J., delivered the opinion of the Court—FIELD, J., concurring.

In the matter of the intervention of T. A. Lynch and others. This case, in its different aspects, has been repeatedly before this Court.  We had supposed, that in the different opinions heretofore delivered, principles had been laid down, by the legitimate application of which, all questions arising in the Court below could have been decided.  As, however, our views have not been correctly understood, we find it necessary to re-state them more explicitly and more in detail.

The case of these intervenors was before us in July, 1857. The orders of the District Court, made in December, 1856, and up to the fifth of January, 1857, were before us, on writ of error. The order, directing a *pro rata* distribution, made May 5th, 1856, and the order refusing to stay proceedings of April 28th, 1856, were before us on appeal.  These cases were argued and submitted together.  The intervenors placed their right upon two grounds; first, fraud on the part of the copartners, in bringing the suit; second, priority by virtue of intervenors' attachments.  As stated in the opinion of the late Chief Justice, delivered at the July term, 1857, "the Court below permitted the intervention to be filed, but refused to stay proceedings in the case or afford the parties any affirmative relief, but directed the receiver to proceed and distribute the money in his hands *pro rata* among the creditors; from which orders and rulings the intervenors have appealed."  The appeal having been taken from *all* the orders and rulings, and the reversal being general, necessarily applied to all.  As stated in the opinion, the "case made involved two propositions; first, whether a creditor of the firm could pursue his remedy at law, after the bill was filed and the receiver appointed, but before a decree of dissolution; and second, whether a creditor could attack the whole proceeding, on the ground of fraud and collusion between the parties." Both of which propositions we decided in the affirmative.  When the verified bill of intervention was filed, the Court below, conceding its allegations to be true, decided that the intervenors

were not entitled to the affirmative relief demanded. Upon appeal to this Court, we decided that, *if* these allegations were *true,* either as to the fraud charged, or as to the attachments, then they were entitled to priority of payment out of the fund in the hands of the receiver. The case was remanded, for the purpose of ascertaining the *truth* of those allegations. The Court below appointed a referee to ascertain and report the facts. The referee reported the facts to the Court, showing the names of the attaching-creditors; the amounts of the various writs of attachment and the judgments rendered thereon, and the time when they were served upon Cohen, the receiver. This report was confirmed by the Court "without prejudice to such further consideration as to its effect, as might be given it upon final decree." The Court afterwards rendered a decree that the fund be distributed *pro rata* among the creditors, and denying the right of the intervenors to any priority in the distribution of the fund, and the intervenors appealed.

In the opinion delivered by the Chief Justice, reference is made to the views expressed in my opinion in the case of Adams & Co. *v.* Hackett & Casserly, January Term, 1857, and those views expressly adopted. In this opinion it was said: "From these cases, it seems to be settled that, until a dissolution has been judicially declared, and a receiver ordered to make a *pro rata* distribution of the partnership assets among the creditors, they are not prevented from resorting to adverse proceedings; and that, when a creditor does resort to such proceedings, he may thereby gain a preference over those creditors who are less diligent."

And in the opinion of the Chief Justice, it was said: "From this it must necessarily result, that the intervenors having acquired a lien upon the property of Adams & Co., by attachment and judgment, prior to the decree of dissolution, are entitled to the fruits of their judgment, and must be first paid."

In the opinion delivered by the Chief Justice, it was held, that "the possession of the receiver was only of such a character as the Court could invest him with in the case made by the bill." The bill of Adams did not allege either a prior *disssolution,* or the *insolvency* of the firm. It prayed *for* a dissolution; an injunction; an accounting; the appointment of a receiver; and the application of the assets to the copartnership debts. Conceding the facts stated in the bill to have been *all* true, as alleged, the case made by it did not authorize a *pro rata* distribution. It is only in cases of *insolvency* that this equitable rule can apply. If the firm be *solvent,* then all the creditors can be paid in full; and there can be no ground for delaying those creditors whose claims are already due, and putting them on a par with those whose claims are not yet due, and requiring all to wait for a distribu-

tion.   It is only in cases of necessity that equity will step in to delay creditors.

The bill not having alleged the insolvency of the firm, there could be no proof made of that fact.   The allegations and proofs must correspond, and the allegations must *precede* the proofs. The Court would not travel out of the record and out of the case, *as made*, to ascertain facts not alleged, admitted, or denied. Woods & Haskell had not answered at the time the attachments were served.   No creditor, *at that time*, had filed a bill of intervention for himself, and on behalf of all the creditors, alleging the insolvency of the firm, and praying a *pro rata* distribution of the assets in the hands of the receiver.   And had such a bill been *afterwards* filed, it could not have destroyed the priority of liens then existing.

The bill was filed by Adams, as appears from its allegations, simply for his own protection.   He moved because the creditors had not moved.   He wished a dissolution to avoid future responsibility, and he asked the injunction, and the appointment of a receiver, for the purpose of taking from Woods and Haskell the power to create further debts, and the power to misapply the assets to their own use.   He wished the assets applied to the payment of the partnership debts, because he was individually responsible for them, and this application of the partnership assets would thus diminish his individual liability.   It was matter of indifference to him whether the assets were applied *pro rata*, or otherwise.   The end contemplated by him would be equally attained in either event.   But, conceding that he desired a *pro rata* distribution, he did not make out a proper case by his bill.

The bill having been filed by Adams, against his copartners, for his own protection, the case was under his control until a decree of dissolution.   Of course, the defendants Woods and Haskell had the right to deny the allegations of the complaint; and then, unless these allegations were sustained by proof, the bill must have been dismissed.   The Court could not compel Adams to prove his allegations.   And the Court would not decree a dissolution without cause.   Who could tell, at the time the attachments were served, that there would be a decree of dissolution?   It was hardly probable that Woods and Haskell would admit the fraud charged.   And if no decree of dissolution was made, no *pro rata* distribution could be had, under the case as made by the bill.   Unless the defendants Woods and Haskell had alleged the insolvency of the firm, in their answer, or some creditor had filed a bill of intervention, alleging that fact, the Court would not inquire into it.   Now, were the creditors to stand idly by and wait the uncertain result of this suit between the partners?   No one could tell when or how it would terminate.

The proposition, that creditors could be delayed by such pro-ceedings, never can, in my view, be reconciled with the equity or the philosophy of the law.

In the case reported in 1 Hoff. Ch. Rep., 524, Smith filed his bill against Waring & Robinson, " alleging certain acts of mis-conduct, stating a dissolution to have been made by consent, and praying an account, an injunction, and a receiver." In that case the bill was not denied; and it was even *there* held that the creditors were not prevented from pursuing their remedies at law and obtaining a preference.

" I consider it, therefore, perfectly clear," said the assistant Vice-Chancellor, "that no creditor was prevented, by the bill of Smith, from proceeding at law against the partners, and obtain-ing an adverse judgment, which, if followed up by a creditor's bill in this Court, would give him a preference. But the right of a copartner to give a confession of a judgment, appears to me not established." (Page 530.)

In the elaborate opinion of the learned Judge of the Fourth District Court, (a printed copy of which is sent up, as a part of his return to the alternative *mandamus,*) certain well-established principles are stated, and from them conclusions drawn, that, in our view, do not follow.

It is true, that a receiver is an officer of the Court, and that the property in his hands is in the custody of the law; but it is equally true that *he holds it for whoever can make out a title to it.* It is also true, that the custody of this fund cannot be changed without the order of the Court by which the appointment was made; but it is equally true, that the service of the attachment does not change the custody of the fund. So it is true that an action cannot be brought against the receiver, without leave of the Court; but it is equally true, that the service of an attach-ment is not the bringing of an action.

When personal property of the defendant is in the possession, or under the control of another person, the attachment is levied by service of notice, and of a copy of the writ. (Code, § 126.) The person having such possession shall be liable to the plaintiff, unless the property be delivered to the sheriff. (Code, § 127.) The Court *may* compel such delivery, after an examination of the custodian on oath. (§ 128.)

But these provisions are not at all inconsistent with the view we have taken. The lien of the attachment commenced when the service was made upon the receiver, who had the property in his possession as receiver, and not in his capacity as an indi-vidual. He, as receiver, was responsible for the property to the attachment-creditors; but this responsibility could only be en-forced through the Court from which his appointment emanated. True, the Court issuing the attachment has the power, in *proper cases,* to order the property to be delivered to the sheriff. But

this discretion must be soundly exercised. The property being already in the hands of the receiver, who had already given security for the faithful discharge of his duties, it would have been error in the Court issuing the attachment to have made such an order. The different principles of the law must be harmoniously applied to the circumstances of the particular case. The lien having attached to the property while in the hands of Cohen, followed it into the hands of Naglee, his successor. The provisions of sections one hundred and twenty-seven and one hundred and twenty-eight, were intended to secure the property *after* the lien has attached. If, therefore, this object is already secured, the Court from which the attachment issues will not proceed any further.

The rule that will not allow the receiver to be disturbed by the suits of others, applies to cases where either the possession of the property is sought to be changed, or where a title is set up by another party, adverse to the original title of the receiver. A *third* party, claiming the property, could not sue for it without the permission of the Court. The receiver cannot be compelled to defend in different Courts. But it was not the legal effect, nor the object of these proceedings by attachment, either to change the custody of the property, or to set up an adverse title to that of Adams & Co. The attachment-creditors admitted the title to be in Adams & Co. The liability of the receiver was not increased. He was only, *as before*, still liable to whomsoever could ultimately make title to the property.

"Where the receiver is in possession of property upon which a third person has a claim for rent, the proper course for the landlord is to apply to the Court, on notice to the receiver, for an order that the receiver pay the rent, or that the landlord be at liberty to proceed, by distress or otherwise, as he may be advised." (Edwards on Receivers, 128.)

The course pursued by the intervenors has been substantially the same. They first obtained a lien by attachment and ultimate judgment; and then, on notice to the receiver, sought a decree, directing him to pay them in the order of their several priorities. We can see in these proceedings no violation of established principles, and no invasion of the jurisdiction of the Court in which the suit of Adams *v.* Woods and Haskell was pending.

In reference to another point, decided by this Court at the July Term, 1857, it is proper to offer some further remarks. The act for the relief of insolvent debtors, provides that "no assignment of any insolvent debtor, otherwise than is provided in this act, shall be legal or binding upon creditors."

This language is clear, explicit, and restrictive. If Adams, Woods, and Haskell, had themselves made an assignment, it would not have been binding upon their creditors. But if the end prohibited by the statute could have been accomplished by

3

the joint act of the copartners, or by the individual act of Adams alone, in instituting this suit, then all they had to do to defeat the purpose prohibited, was to change their *mode* of operations. The statute intended to defeat all assignments made by *the insolvent*. Now, whether this purpose be accomplished by the act of the *insolvent*, in one form or another, is immaterial. But we do not mean to say that the *creditors*, on their part, could not have filed a bill, and by that means procured a *pro rata* distribution.

There has been no conflict in the judgments made by this Court in this case. Different Justices of the Court have differed as to the reasons given. This is explained in the opinion of the Chief Justice, delivered in July last.

The decree of the Court below is reversed, and that Court will render a decree, directing the receiver to distribute the proceeds in his hands, and all such proceeds as may hereafter come into his hands, first to the several intervenors, in the order of the priority of their respective attachments, and then the remainder to the other creditors, *pro rata*.